[No. 20358.    Department Two.    March 10, 1927.]

LLOYD B. DYSART, *Trustee in Bankruptcy, Appellant,*
v. COLONIAL FIRE UNDERWRITERS *et al., Defend-*
*ants,* MAYTOWN MILL COMPANY *et al.,*
*Respondents.*[1]

[1] VENDOR AND PURCHASER (31)—EXECUTORY CONTRACT—DESTRUCTION OF PROPERTY—EFFECT ON TITLE. Since an executory contract for the sale of real estate is valid and binding as to the parties notwithstanding it vests no title, legal or equitable, in the vendee, upon destruction of the buildings by fire while the contract is in good standing, the vendor is entitled only to the balance of the purchase price out of insurance money which was payable under the policies to the vendor as its interest may appear; and therefore he cannot forfeit the contract for non-payment of installments or claim the balance of the insurance money or the property, which thereupon belong to the vendee through full payment of the purchase price.

[2] CORPORATIONS (208) — PREFERENCES—TRUST FUND DOCTRINE — ADVANCES—RIGHT TO REPAYMENT. Preferential assignments of insurance policies, in connection with a contract securing and protecting a conditional sales vendor for an indebtedness due from an insolvent corporation to its principal creditor, are fraudulent as to the other creditors and void under the trust fund doctrine, regardless of whether or not the policies have no surrender value and are valid under the Federal bankruptcy act because the bankrupt's estate was not thereby depleted.

[1]Reported in 254 Pac. 240.

Cross-appeals from a judgment of the superior court for Thurston county, Wilson, J., entered October 21, 1926, upon findings in favor of the defendants in consolidated actions by a trustee in bankruptcy to recover assets of an insolvent corporation, tried to the court. Reversed on plaintiff's appeal.

*John C. Hogan* and *Lloyd B. Dysart,* for plaintiff-appellant.

*Vance & Christensen (W. H. Abel,* of counsel), and *Frank C. Owings,* for defendants-appellants.

Tolman, J.—This action comes here as a consolidation of eighteen actions at law brought by the plaintiff, based upon twenty-six policies of insurance issued by eighteen different insurance companies, to recover an aggregate of $72,500, claimed to be due for loss under the policies. The facts are long, very much involved, and, singularly, but little in dispute. We shall give a general outline of what we consider the controlling facts necessary for an understanding of the case, and in doing so shall refer to the appellant Dysart as the plaintiff, the cross-appellant Maytown Mill Company as the mill company, George Simpson and Mark E. Reed, as the administrator of his estate with the will annexed, as Simpson, and the J. L. Jackson Lumber Company as the bankrupt.

It appears that, on and prior to September 22, 1924, the mill company was in possession of, and had a contract for the purchase of, the property which was afterwards insured. On that day, the mill company, as vendor, entered into a conditional sales contract with Barker & Jackson, a co-partnership, as vendees, for the sale and purchase of the real estate, buildings, mill and personal property afterwards insured and destroyed.

The contract is very much in the usual form of such contracts, except the following:

"There being certain litigation now pending between the Mill company and George Simpson (Maytown Lumber Company being a party thereto with said Simpson) now if and when the mentioned litigation shall have been finally determined including any and all appeals, if the said George Simpson (Maytown Lumber Company being a party thereto with said Simpson) shall have obtained any money judgment against the Mill Company the mentioned bank as trustee shall pay to the said Simpson (Maytown Lumber Company being a party thereto with said Simpson) the full amount of said judgment out of the trust funds in its hands, and shall hold the remainder of the said trust fund, if any there be, to the credit and subject to the order of the Mill Company. . . .

"The partners agree to pay as a condition herein insurance premiums on policies of insurance on said premises during the life of this contract, said insurance to be equal at least to the amount of the unmatured purchase price hereof with endorsements on said policy, loss, if any, payable to the Company as its interest may appear."

The policies, or most of them, were written in accordance with both of these quoted provisions, and that probably explains why the mill company and Simpson were made parties. This contract was not filed for record until some nine months after it was executed, and but a few days before the fire occurred. The partnership of Barker & Jackson duly organized a corporation to take over and operate under the contract. This corporation was first called the Maytown Lumber & Manufacturing Company, but the name was later changed to J. L. Jackson Lumber Company, and the contract was assigned, with the consent of the mill company, to the J. L. Jackson Lumber Company, which took possession of the property and operated it until

the summer of the following year, when, its insolvency being apparent, it was declared a bankrupt.

The bankrupt, while in possession of the property, made substantial improvements, and gave evidence to the effect that these were of the value of some $15,000. The bankrupt also, while in posesssion of the property, paid all of the maturing instalments under the contract, so that up to July 21, 1925, it had paid $11,500, besides interest, upon a purchase price of $25,000. On or about July 21, 1925, the bankrupt had become very much involved financially, was no longer able to continue in business, and it at that time transferred to Simpson, who was a creditor to the extent of nearly $25,000, all of its assets here involved, including, perhaps, the insurance policies. Simpson took possession, and between that time and July 28, 1925, when the fire occurred, he made a further payment of $1,500 as an instalment then due to the mill company upon the conditional sales contract, so that when the fire occurred there remained unpaid to the mill company only $12,000 of the purchase price of the property.

On July 31, 1925, an involuntary petition in bankruptcy was filed against the J. L. Jackson Lumber Company, and on August 5, 1925, it was adjudged a bankrupt, and thereafter the plaintiff was duly elected and qualified as its trustee. After these actions were instituted against the insurance companies and before trial, a settlement was arranged with the insurance companies under and by which they paid into court $57,600 in full settlement of their liability, and thereupon they were dismissed from the action. The parties remaining, to wit, the plaintiff, the mill company and Simpson, then entered into a stipulation, as follows:

"Whereas, all of the parties to this cause and in causes No. 10480, 10481, 10482, 10483, 14834, 10787, 10488, 10489, 10490, 10491, 10492, 10493, 10494, 10495,

10499, have this day entered into a compromise in writing, which is of record herein, in so far as the liability of the insurance companies is concerned, now, therefore, it is

"Stipulated between the plaintiff and defendants George Simpson and/or Maytown Lumber Company and Maytown Mill Company, that when the sum of $57,600.00 is paid into the registry of the court pursuant to such compromise, the clerk of said court shall retain $48,000.00 thereof until the rights of the parties signing this stipulation are adjudicated, and he shall pay to Gould & Gould, Inc., the sum of $600.00 thereof, and to George Simpson and/or Maytown Lumber Company the sum of $1,500.00 thereof, and that the remainder of said sum, to-wit, the sum of $7,500, shall remain in the registry of the court in cases No. 10485 and 10486." (The last two policies mentioned covered manufactured lumber, hence the distinction.)

The issues as between the parties to this stipulation were tried to the court sitting without a jury, and long and exhaustive findings of fact were made, setting up in detail the court's findings upon all of the matters which we have hereinbefore referred to, and, in addition, findings that the mill company acquired title to the property described in the conditional sales contract shortly after that instrument was executed and that it (the mill company) was the owner of all of such property at the time of the fire, and that long after the fire, on the 18th day of December, 1925, the mill company gave a twenty days' notice of forfeiture under the terms of the contract because of the non-payment of instalments of the purchase price falling due after the date of the fire. The court also found that the value of the property subject to the contract not destroyed was $2,500, and that

"On May 19, 1925, the J. L. Jackson Lumber Company was indebted to Geo. Simpson on an unsecured open account in the sum of $24,968.00 or thereabouts,

and that on that date the J. L. Jackson Lumber Company entered into a contract with Geo. Simpson whereby the J. L. Jackson Lumber Company undertook to assign certain insurance policies or interest in insurance policies to Geo. Simpson as security for this debt and agreed that in the event of financial disaster overtaking the J. L. Jackson Lumber Company the latter company would assign to Geo. Simpson the conditional sale contract of September 22, 1924, and other property; and that afterwards and on July 21, 1925, the J. L. Jackson Lumber Company did make an assignment and bill of sale covering the conditional sale contract of September 22, 1924, and all of its interest in the property covered thereby, including all of its assets to the said Geo. Simpson; that at the time of making each of these contracts, namely on May 19, 1925, and on July 21, 1925, the J. L. Jackson Lumber Company was insolvent and was known to be insolvent at that time by Geo. Simpson and that under this assignment and bill of sale of July 21, 1925, Geo. Simpson entered into possession of the saw-mill plant and assets of the J. L. Jackson Lumber Company and remained in possession up to the time of the fire which occurred July 28, 1925.''

The court made conclusions of law as follows:

"I.    That there should be paid to defendant Geo. Simpson from said funds the sum of fifteen hundred dollars ($1,500.00) in accordance with said stipulation, and in addition thereto the further sum of fifteen hundred dollars ($1,500.00) from said fund of forty-eight thousand dollars ($48,000.00) and no more.

"II.    That there should be paid to the plaintiff by the clerk the sum of seven thousand five hundred dollars ($7,500.00) in causes Nos. 10485 and 10486 and the further sum of eleven thousand five hundred dollars ($11,500.00) out of the forty-eight thousand dollars ($48,000.00) fund aforesaid.

"III.    That there should be paid by the clerk to the defendant Maytown Lumber Company the sum of thirty-five thousand dollars ($35,000.00) out of said fund of forty-eight thousand dollars ($48,000.00).

"IV.   That there should be paid to Gould & Gould, Inc., from said funds six hundred dollars ($600.00) in accordance with said stipulation.

"V.   That defendant Maytown Mill Company is entitled to its costs and disbursements herein."

The plaintiff took exceptions to all those findings of fact showing, or tending to show, title to the property covered by the conditional sales agreement to be in the mill company, to the conclusion of law allowing Simpson $1,500 in excess of the amount provided to be paid him by the stipulation, and to those conclusions permitting recovery and allowing costs to the mill company. The mill company excepted to the conclusions of law adverse to it, but took no exceptions to the findings of fact. Appellant Reed, in his brief, states that exceptions were duly and properly taken by all parties and this apparently is not disputed, but we find no exceptions in the record by or on behalf of Simpson or his successor in interest, Reed.

Plaintiff, by his assignments of error, raises three questions only:   (1) That it was error to allow recovery to the mill company of any greater sum than $12,000 and interest, being the unpaid portion of the purchase price under the conditional sales contract; (2) that there should be deducted from the $12,000, $2,500 as the value of the property after the fire, or in the alternative that the mill company should be required to convey the remaining property to the plaintiff; and (3) that it was error to allow to Simpson $1,500 in excess of the $1,500 provided to be paid him by the stipulation. The mill company makes the same assignment as to the allowance to Simpson, and further assigns error in the awarding of $11,500 to the plaintiff and the refusal to award the whole of the $48,-000 fund to the mill company. Simpson seems to base

error upon the failure to award him the whole fund, less the stipulated withdrawals.

At the outset, we are confronted by a motion to dismiss both cross-appeals because not taken within ten days after the service of notice of plaintiff's appeal; but in view of the conclusions we have reached upon the merits, it will be unnecessary to consider or pass upon these motions.

[1] On the plaintiff's appeal, we have a simple question of the rights of a vendee under an executory contract for the sale of both real estate and personal property. The trial court seems to have misconstrued our previous holdings, and the effect of his judgment was to return to the vendees what they had paid upon the purchase price and permit the vendor to recover the balance, as though the contract had been rescinded by mutual consent. While we have said that such contracts convey no element of title (*Ashford v. Reese,* 132 Wash. 649, 233 Pac. 29), we have never gone further. But recently, in the case of *Pratt v. Rhodes, ante* p. 411, 253 Pac. 640, we said:

"It was not there meant that an executory contract for the sale of land vests no right in the vendee which the court will enforce at the suit of the vendee. It is not held that such a contract is a nullity. The contract, on the contrary, has all of the validity that any other executory contract has which is duly and regularly executed by parties competent to contract."

Such contracts, therefore, are good and enforceable between the parties according to their terms. So here, the parties by the terms of their contract fixed the rule which must govern them, and having in plain language provided that the insurance money should be paid to the vendor as its interest may appear, under the well known and commonly accepted meaning of that term, the vendor was entitled to receive the unpaid balance

of the purchase price out of the insurance money, and no more, because that payment would extinguish its interest in the subject-matter of the contract, and thereafter the remainder of the insurance money and the property remaining undestroyed would belong to the vendee, and it could maintain an action to recover the money and to compel the delivery of a deed which would vest the title in it; provided, always, of course, that the contract was in good standing and had not been forfeited. There is no question here but that at the time of the fire the contract was in good standing. No attempt was made to forfeit it for some four or five months after the fire.

In the case of *Ashford v. Reese, supra,* the court was dealing with a situation where no insurance was provided for in the contract. But even so, it does not seem logical to us that a party who can no longer perform, by reason of the destruction of the subject-matter which he has agreed to convey, can thereafter by any act of his place the other party in default and compel a forfeiture. But however that may be, in this case by the simple terms of the contract the parties have provided for insurance and provided how the money arising therefrom should be distributed. Hence, when the fire occurred, their rights became fixed. The vendor was entitled to be paid the balance of the purchase price, without regard to the maturities named in the contract, as and when the insurance money should be collected, and it had no other or further rights, and hence could not declare a forfeiture. It was tendered, by the plaintiff's offer, a judgment for all it was entitled to receive, which tender it refused, and the mill company has now no legal or just cause for complaint.

So, as between the plaintiff and the mill company,

the plaintiff is entitled to all of the insurance money over and above $12,000 and interest, and the plaintiff is also entitled to a conveyance of the title of the remaining property to him. What is said here disposes also of the cross-appeal of the mill company.

[2]  On behalf of Simpson, it is urged that the policies were assigned to him on May 19, 1925, that they then had no surrender value, that therefore the bankrupt's estate was not depleted by the transaction, and hence the transfer is not void under the bankruptcy law. We do not propose to follow and answer this argument or review the Federal cases upon which Simpson relies, because we think the transaction comes clearly within the ban of our trust fund theory as applied to insolvent corporations.

Whether the insurance policies might have been assigned, separate and apart from the property insured, we do not determine (although there are provisions in the policies forbidding such an assignment), because it seems plain to us that though evidenced by two instruments, the whole proceeding was one transaction. In the first agreement between the bankrupt and Simpson, dated May 19, 1925, appears the following:

"And, whereas, vendee is desirous of securing and protecting vendor in all reasonable ways and it agrees that the insurance policies belonging to it and protecting its plant and properties against loss by fire and the like shall, in the manner prescribed by the rules and practice of the insurance companies issuing said policies, or policy, be assigned to the vendor as collateral security for the old indebtedness evidenced by the said notes as vendor's interest may appear; and, with the same view of reasonably securing the vendor, agrees to execute to the interest and credit of the said vendor bill of sale to the stock of manufactured lumber in, about and upon its yards and docks, conditioned, however, that vendee may have the right to sell and

dispose of the same in the usual and orderly course of business, it being the intention of this latter covenant that if financial disaster should overtake vendee the vendor shall have a preferred lien against the manufactured lumber in its yards and docks, subject always to the reserved right to vendee to move the same in the ordinary course of business. And it agrees to renew the said bill of sale containing all the mentioned conditions at the expiration of each thirty day period following the execution of the first bill of sale. And to the same end of securing and protecting vendor as far as may be, vendee does agree that, if financial disaster should overtake it and it should be compelled to consider the sale of a certain conditional sales contract that it has made with Maytown Mill Company, a corporation, covering the purchase of the plant now owned and operated by vendee, it will and shall treat the vendor as a preferred assignee of the said conditional sales contract, and agrees to subrogate the vendor to all of its rights in the premises in the event that the contingency above referred to should occur.''

The subsequent contract of July 21, 1925, amounts to no more than a conveyance of the tangible property accordingly; it does not mention the insurance policies, nor do we understand that the insurance policies were ever actually assigned. But however that may be, these two contracts, construed together, as they must be, reveal one completed transaction, and that transaction is preferential in character. That the corporation was insolvent on both dates and at all times between, the trial court found, and, as we read the evidence, that finding cannot be disputed. We, therefore, unhesitatingly find that the transaction purporting to assign the insurance policies was preferential and void under the trust fund doctrine.

Simpson did, however, after receiving the preference, pay to the mill company $1,500 as an instalment then due under the conditional sales contract, and to that extent he falls within the rule announced in *Terhune*

*v. Weise,* 132 Wash. 208, 231 Pac. 954, and *Smith v. National Bank of Commerce, ante* p. 428, 253 Pac. 644. Since the sum thus paid went to discharge the claim of the mill company *pro tanto* and to that extent enhanced the value of the bankrupt estate, Simpson is in equity entitled to its repayment out of the insurance money. The trial court so held, and the allowance thus made must be affirmed.

The judgment appealed from will be affirmed upon both cross-appeals, but reversed upon the plaintiff's appeal, with directions to modify as herein indicated.

MACKINTOSH, C. J., BRIDGES, PARKER, and ASKREN, JJ., concur.